# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CARMA HOLDCO INC., a Delaware corporation, | Case No. |
| Plaintiff, | **COMPLAINT** |
| v. | |
| CHAD BRONSTEIN, an individual; NICOLE COSBY, an individual; RAHM, INC. dba REAL AMERICAN BEER, a Delaware corporation; and DOES 1 through 25 inclusive, | |
| Defendants, | **JURY TRIAL DEMANDED** |

Plaintiff CARMA HOLDCO INC. complains and alleges as follows:

## THE PARTIES

1.      Plaintiff CARMA HOLDCO INC. ("CARMA" or "Plaintiff") is, and at all times mentioned herein was, a Delaware corporation with its principal places of business in the City of Chicago, Cook County, Illinois, and/or the City of Las Vegas, Clark County, Nevada.

2.      Plaintiff is informed and believes, and based thereon alleges, that Defendant CHAD BRONSTEIN ("Bronstein") is, and at all times relevant herein was, an individual and citizen residing in the City of Chicago, Cook County, Illinois and/or the City of Tampa, Hillsborough County, Florida.

3.      Plaintiff is informed and believes, and based thereon alleges, that Defendant NICOLE COSBY ("Cosby") is, and at all times relevant herein was, an individual and citizen residing in Washington D.C.

4.     Plaintiff is informed and believes, and based thereon alleges, that Defendant RAHM, INC. dba REAL AMERICAN BEER ("RAHM") is, and at all times relevant herein was, a Delaware corporation with its principal place of business in the City of Clearwater Beach, Pinellas County, Florida.

5.     The true names and capacities of Defendants, DOES 1 through 25, inclusive, are unknown to Plaintiff, which therefore sues said Defendants by such fictitious names. Plaintiff will seek leave of Court to amend this Complaint if and when their true names and capacities have been ascertained. Plaintiff is informed and believes, and based thereon alleges, that each of the fictitiously named Defendants are responsible in some manner for the occurrences herein alleged and that Plaintiff's damages as herein alleged were proximately caused by such Defendants.

6.     Plaintiff is informed and believes, and based thereon alleges, that each of the Defendants were and are in some manner responsible for the actions, acts, and omissions herein alleged, and for the damage caused by the Defendants, and each of them, and are therefore jointly and severally liable for the damages caused to Plaintiff. Plaintiff is informed and believes, and based thereon alleges, that each of said Defendants is responsible in some manner for the wrongful conduct alleged herein.

7.     Plaintiff is informed and believes, and based thereon alleges, that at all times mentioned herein, each Defendant was the agent, servant, and employee of the other Defendants, and each of them, and in committing the acts and omissions herein mentioned, were acting within the course and scope of said agency, servitude, and employment. At all times mentioned herein, each Defendant was chargeable with and bound by the knowledge and information received by and on behalf of each of the other Defendants. All of the acts of the Defendants, and each of them, were ratified and adopted by the acts of their co-Defendants, and each of them.

8.      Wherever appearing in this Complaint, each and every reference to Defendants, or to any of them, is intended to and shall refer to all Defendants, named and unnamed, including all fictitiously named Defendants, unless said reference is otherwise specifically qualified.

## JURISDICTION AND VENUE

9.      This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §1331, in that one of the claims in this case is a claim arising under 18 U.S.C. §1836, the Defend Trade Secrets Act. This Court has supplemental jurisdiction over the state law claims as they form a part of the same case and controversy under 28 U.S.C. §1367(a).

10.     This Court has personal jurisdiction over Defendants Bronstein and Cosby because the Executive Agreements ███████████████ between Plaintiff, Bronstein, and Cosby provide for jurisdiction in the courts in Chicago, Illinois. This Court has personal jurisdiction over Defendant RAHM because it conducts business in and has sufficient minimum contacts with Illinois.

11.      Venue is proper in this District pursuant to 28 USC §1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district, or pursuant to 28 USC §1391(b)(3) because Defendants are subject to the Court's personal jurisdiction with respect to this action.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

12.     Plaintiff CARMA is a company that is engaged in the business of creating, acquiring, developing, licensing, and distributing various intellectual property assets and has worked with several celebrities to license their names and likenesses to a variety of other companies for use on their products. One such celebrity was the famous professional wrestler, Terry Bollea aka Hulk Hogan ("Hulk Hogan").

13.     On or about May 1, 2022, CARMA and Defendant Bronstein entered into an Executive Employment Agreement to hire Bronstein as the President and Chairman of the Board of Directors. A copy of the Bronstein Executive Employment Agreement is attached as Exhibit 1 (the "Bronstein Executive Agreement").

14.     On or about June 8, 2022, CARMA and Defendant Cosby entered into an Executive Employment Agreement to hire Cosby as the Chief Legal & Licensing Officer reporting to Bronstein. A copy of the Cosby Executive Employment Agreement is attached as Exhibit 2 (the "Cosby Executive Agreement").

15.     Section 7 of the Executive Agreements both provided for the protection of Confidential Information which was broadly defined to include all information, knowledge and data that was not generally known to the public and included items such as proprietary information, trade secrets, know-how, research, designs, drawings, marketing, finances, forecasts, product plans, business plans, business strategy, and information concerning CARMA's products, services, and markets.

16.     Section 7 of both Executive Agreements provided that, during their employment and thereafter, Bronstein and Cosby would (i) hold the Confidential Information in the strictest confidence and not directly or indirectly copy, distribute, disclose, divert, or disseminate, or give access to any Confidential Information to any person, firm, corporation, association, or other entity except authorized agents of CARMA with a need to know and other persons for the benefit of CARMA in the course and scope of their employment; and (2) that Bronstein and Cosby would refrain from directly or indirectly using the Confidential Information other than as necessary and as authorized in the course and scope of their employment.

17.     Section 8 of the Bronstein Executive Agreement provided that, for a period of one year after his termination, Bronstein would not engage in Business (as defined later in the agreement) in a capacity similar to his job functions with CARMA or have any financial interest in any company or entity engaging in the Business or make any loans to any company or entity engaging in the Business. The term "Business" was then broadly defined and included the provision, development, marketing, sale, or maintenance of products or services which were substantially similar to those actually or actively planned to be developed, marketed, distributed, sold, maintained, or otherwise provided by CARMA.

18.     Section 9 of both Executive Agreements provided that Bronstein and Cosby would not solicit Company Employees, Customers, or Business Relations of CARMA during their employment or for a year after their termination.

19.     Section 10 of both Executive Agreements provided that Bronstein and Cosby understood the importance of CARMA's relationships with its Business Relations, Customers, and employees, and that CARMA's Confidential Information was critical to the business and success of CARMA. Bronstein and Cosby, therefore, agreed that the scope and duration of the restrictions and limitations described in the Executive Agreements, particularly in Sections 7 and 9 (and section 8 in the case of the Bronstein Executive Agreement) were reasonable and necessary to protect the legitimate business interests of CARMA, and that all restrictions and limitations relating to the period following the end of Bronstein and Cosby's employment would apply regardless of the reason their employment ends.

20.     Section 11 of the Executive Agreements defined Intellectual Property broadly and included, among other things, trade secrets, concepts, ideas, designs, trademarks, trade names, customer lists, vendor lists, marketing plans (including brand and logo work), and any other

information relating to the Company's business. Section 11 provided that Intellectual Property that Bronstein or Cosby solely or jointly conceived, reduced to practice, authored, or otherwise created or caused to be conceived, reduced to practice, authored, or otherwise created during their employment with CARMA or for a period of six (6) months following their termination was Company Intellectual Property. Additionally, Bronstein and Cosby were required to make full written disclosure and to hold any such Company Intellectual Property in trust for the sole right and benefit of CARMA. Section 11 further provided that Bronstein and Cosby irrevocably assigned such Company Intellectual Property to CARMA.

21.     Section 15 of the Executive Agreements provided that CARMA would be entitled to any remedies including damages and injunctive relief enjoining Bronstein and/or Cosby (and those acting in concert with them) from breaching the Executive Agreements, and that the prevailing party would be entitled to recover its reasonable attorneys' fees and costs.

22.     CARMA first began discussing a relationship with Hulk Hogan in or about February 2023, and in or about May 2023, entered an agreement with Hulk Hogan for him to act as a brand ambassador.

23.     In or about July 2023, during the term of Bronstein and Cosby's employment, CARMA, through Bronstein, began discussions to develop a beer brand involving Hulk Hogan, and August and Billy Busch of the Busch family made famous in relation to the Anheuser-Busch brand.

24.     On or about August 15, 2023, CARMA's CEO hired a designer to create beer can designs for "The Real American" brand by Hulk Hogan. He instructed the designer to focus on an all-American beer with themes including guns, American flags, and Hulk Hogan. The designer moved forward on proposed designs for Hulk Hogan's All-American Lager and Hulk Hogan's

Patriot Pilsner, and on or about September 26, 2023, the designer provided CARMA with design options.

25.     CARMA's plans for the concept and business plans for Hulk Hogan's Real American brand beer were not publicly known and constituted Confidential Information and Company Intellectual Property as defined by the Executive Employment Agreements.

26.     Bronstein, as President and Chairman of the Board of Directors, was intimately involved in and familiar with CARMA's plans for Hulk Hogan's Real American brand beer. During this time, CARMA was in active discussions with August and Billy Busch, who controlled a trademark for the Real American Lager brand name, to form a joint venture in relation to Hulk Hogan's Real American brand beer.

27.     Cosby, as CARMA's Chief Legal & Licensing Officer reporting to Bronstein was also well aware of these business plans.

28.     However, it came to CARMA's attention that Bronstein has structured the proposed deal for Hulk Hogan's Real American brand beer in such a way that Bronstein would personally benefit with an ownership interest in the venture, and that he was taking similar actions on other deals that were in various stages of discussions. Further, Cosby was authorizing these arrangements as counsel for CARMA.

29.     Therefore, Bronstein and Cosby were terminated by CARMA for cause on or about November 17, 2023.

30.     On or about November 24, 2023, CARMA and Bronstein entered into a Separation Agreement ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. The Bronstein Separation Agreement provided for ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ A copy of

the Bronstein Separation Agreement is attached as Exhibit 3 (the "Bronstein Separation Agreement").

31.    On or about February 27, 2024, CARMA and Cosby also entered into a Separation Agreement ███████████████████████████████████. The Cosby Separation Agreement provided for ███████████████████████████████████ ████████████████████████████████. A copy of the Cosby Separation Agreement is attached as Exhibit 4 (the "Cosby Separation Agreement").

32.    Section 11 of the Separation Agreements both provided that ██████████ ██████████████████████████████████████████████████████ ██████████████████████████████████.

33.    In addition, Section 12 of the Separation Agreements provided that ██████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████.

34.    Further, Section 12 of the Bronstein Separation Agreement provided that, ██████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████.

35.    Section 14 of the Separation Agreements provided that, ████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ███████████████████████████.

36. Subsequently to Bronstein and Cosby's terminations, CARMA attempted to continue discussions with Hulk Hogan, and August and Billy Busch in regard to Hulk Hogan's Real American beer brand. However, Hulk Hogan soon began neglecting his duties under his ambassador agreement and refused to communicate with CARMA, so the relationship with him deteriorated and was eventually terminated.

37. Plaintiff is informed and believes, and based thereon alleges, that after their termination, Bronstein and Cosby continued to have discussions with Hulk Hogan, his representatives, and August and Billy Busch concerning Hulk Hogan's Real American brand beer, and they solicited Hulk Hogan to cease his relationship with CARMA and enter a business relationship with RAHM to sell Hulk Hogan's Real American brand beer.

38. RAHM INC. was then formed on or about March 27, 2024, just a few months after Bronstein and Cosby's separation from CARMA.

39. Plaintiff is informed and believes, and based thereon alleges, that Bronstein was and is a founder and shareholder of RAHM, and was and is the President and a Director of RAHM.

40. Plaintiff is informed and believes, and based thereon alleges, that Cosby was and is a founder and shareholder of RAHM, and was and is the General Counsel of RAHM.

41. On or about June 10 and 11, 2024, RAHM filed trademark registration applications for the following marks:

| Mark | Serial No. | Goods/ Services |
| --- | --- | --- |
| REAL AMERICAN BEER | 98594121 | IC 021: Non-electric portable coolers, beer mugs, bottle openers, bottles, bowls, buckets, pails, coin banks, cups, decanters, dishes, drinking bottles for sports, drinking glasses, drinking vessels, funnels, glasses being receptacles for drinking, ice buckets, ice pails, |

| | | |
|---|---|---|
| | | insulating sleeve holders made of neoprene or rubber for beverage cans or bottles, menu card holders, mugs, paper plates, place mats not of paper or textile, signboards of porcelain or glass, table mats not of paper or textile, tankards<br><br>IC 025: Shirts, short-sleeve shirts, hats, bandanas, visors, swimsuits, bathing trunks, beach clothes, beach shoes, belts, boxer shorts, caps being headwear, embroidered clothing, headbands, headwear, jackets, jerseys, sandals, skull caps, socks, sports jerseys, tee-shirts, wall hanging of textile, tapestry of textile<br><br>IC 028: Swimming floats for recreational use, balls for games, body-building apparatus, body-training apparatus, cornhole bags, cornhole game boards, cornhole game sets containing bags and boards, darts, flying discs, game tables, inflatable games for swimming pools, kites, masks, paddleboards, play balloons, playing balls, playing cards, plush toys, skateboards, stuffed toys, surfboards, swimming jackets, swimming pool air floats, teddy bears, toy figures, toy vehicles, weight lifting belts<br><br>IC 035: Beer, beer-based cocktails, Non-alcoholic beer flavored beverages |

| | 98594268 | IC 032: Beer; Beer-based beverages; Beer-based cocktails; Non-alcoholic beer; Non-alcoholic beer flavored beverages |
|---|---|---|
| REAL AMERICAN | 98594090 | IC 021: Non-electric portable coolers, beer mugs, bottle openers, bottles, bowls, buckets, pails, coin banks, cups, decanters, dishes, drinking bottles for sports, drinking glasses, drinking vessels, funnels, glasses being receptacles for drinking, ice buckets, ice pails, insulating sleeve holders made of neoprene or rubber for beverage cans or bottles, menu card holders, mugs, paper plates, place mats not of paper or textile, signboards of porcelain or glass, table mats not of paper or textile, tankards

IC 025: Shirts, short-sleeve shirts, hats, bandanas, visors, swimsuits, bathing trunks, beach clothes, beach shoes, belts, boxer shorts, caps being headwear, embroidered clothing, headbands, headwear, jackets, jerseys, sandals, skull caps, socks, sports jerseys, tee-shirts, wall hanging of textile, tapestry of textile

IC 028: Swimming floats for recreational use, balls for games, body-building apparatus, body-training apparatus, cornhole bags, cornhole game boards, cornhole game sets |

| | | |
|---|---|---|
| | | containing bags and boards, darts, flying discs, game tables, inflatable games for swimming pools, kites, masks, paddleboards, play balloons, playing balls, playing cards, plush toys, skateboards, stuffed toys, surfboards, swimming jackets, swimming pool air floats, teddy bears, toy figures, toy vehicles, weight lifting belts<br><br>IC 032: Beer, beer-based cocktails, Non-alcoholic beer flavored beverages, non-alcoholic beverages, energy drinks, lemonades, water being a beverage<br><br>IC 033: Alcoholic beverages, except beer, alcoholic cocktails, gin, pre-mixed alcoholic beverages, other than beer-based, rum, spirits, being beverages, vodka and whiskey<br><br>IC 035: Advertising, marketing, promotional services, business management, business administration, office functions including online retail store management and administration, marketing, and promotional services |
| HULK HOGAN REAL AMERICAN BEER | 985942222 | IC 032: Beer; Beer-based cocktails; Non-alcoholic beer; Non-alcoholic beer flavored beverages |

|  | 98595122 | IC 032: Beer; Beer-based cocktails; Non-alcoholic beer; Non-alcoholic beer flavored beverages |
|---|---|---|

42.     On or about June 13, 2024, RAHM officially launched Real American Beer marketing its products using Hulk Hogan's name and likeness.

43.     Further, on or about July 29, 2024, RAHM obtained an assignment of the REAL AMERICAN LAGER trademark (Reg. No. 5356835) from the company controlled by August and Billy Busch who CARMA had been in discussion with.

44.     In addition, on or about April 28, 2025, RAHM filed additional trademark applications for its REAL AMERICAN BEER logos in additional classes (Serial Nos. 99159795 and 99159560).

45.     Since its launch in 2024, RAHM has continued to market and expand the Real American Beer brand.

46.     The above actions by Bronstein and Cosby were in direct breach of the provisions of their respective Executive Agreements and Separation Agreements as outlined above, and violate both federal and state trade secret protection laws, among other laws.

47.     As a consequence of Defendants' actions as alleged above, Plaintiff has been damaged in an amount to be proven at trial but at least ten million dollars.

## FIRST CAUSE OF ACTION

### BREACH OF CONTRACT

### (Against Defendants Bronstein, Cosby, and DOES 1-25)

48.     Plaintiff incorporates by reference and realleges the preceding paragraphs as though fully set forth herein.

49. Plaintiff CARMA entered into the above referenced Executive Agreements and Separation Agreements with Bronstein and Cosby.

50. Plaintiff has performed all, or substantially all conditions, covenants, and promises required to be performed on its part in accordance with the terms and conditions of the Executive Agreements and the Separation Agreements, except for those obligations that were waived or excused by the actions of Bronstein and Cosby.

51. Bronstein and Cosby breached the Executive Agreements ███████████ ████████ by:

    a. Misappropriating, disclosing, and using CARMA's Confidential Information for their own benefit and the benefit of RAHM, including CARMA's business plans, concepts, and marketing strategy for Hulk Hogan's Real American brand beer;

    b. Contacting and soliciting Company Employees and Business Relations of CARMA, including Hulk Hogan, within one year of their terminations; and

    c. Failing to disclose, hold in trust, and assign Company Intellectual Property conceived, reduced to practice, authored, or otherwise created or caused to be conceived, reduced to practice, authored, or otherwise created during their employment with CARMA or for a period of six (6) months following their terminations, including for use with Hulk Hogan's Real American brand beer.

52. In addition, Bronstein further breached the Bronstein Executive Agreement ███ ██████████████████████ by:

      a.      Engaging in Business in a capacity similar to his job functions with CARMA and having financial interests in a company engaging in the Business, within one year of his termination.

53.      As a direct and proximate result of Defendants' breaches, Plaintiff has suffered damages in an amount to be proven at trial but at least ten million dollars.

54.      In addition, Plaintiff is entitled to restitution in the amount of $348,000.00 from Bronstein and $231,333.33 from Cosby ███████████████████████████.

███Plaintiff also seeks recovery of its attorneys' fees and costs pursuant to the terms of the Executive Agreements ████████████████.

## SECOND CAUSE OF ACTION

### VIOLATION OF DEFEND TRADE SECRETS ACT (18 U.S.C. §1836, et seq.)

### (By Plaintiff Against All Defendants)

56.      Plaintiff incorporates by reference and realleges the preceding paragraphs as though fully set forth herein.

57.      Defendants violated the Defend Trade Secrets Act, 18 U.S.C. §1836, et seq. (the "DTSA") by misappropriating trade secrets from Plaintiff for services used in, or intended for use in, interstate commerce.

58.      Defendants possessed Plaintiff's trade secrets under the DTSA including the business plans, concepts, and marketing strategy for Hulk Hogan's Real American brand beer.

59.      Plaintiff is informed and believes, and based thereon alleges, that Defendants are using and will continue to use Plaintiff's trade secrets to conduct business.

60.      Plaintiff invested substantial time and resources to generate the concept and business plan for Hulk Hogan's Real American brand beer. The information contained in these

materials derived independent economic value by virtue of not being known or available to the public. Plaintiff kept this information sufficiently secret to give it a competitive advantage. It has taken affirmative measures to prevent others from acquiring it or using it by means including, but not limited to, requiring those who had access to it (including Defendants Bronstein and Cosby) to sign agreements restricting their use of Plaintiff's confidential information. Further, access to Plaintiff's systems, including employees' computers, is password protected.

61. Plaintiff communicated its trade secrets to Defendants Bronstein and Cosby in confidence and they knew that Plaintiff intended its trade secrets to remain confidential. As such, they promised to keep Plaintiff's trade secrets confidential, and to use Plaintiff's trade secrets only on behalf of Plaintiff.

62. Defendants Bronstein and Cosby, acting on behalf of themselves and RAHM, misappropriated trade secrets belonging to Plaintiff by unauthorized disclosure and use.

63. Due to their positions of founding and working for RAHM, a direct competitor of Plaintiff, and their continuing development and marketing of RAHM's Real American Beer brand, there is a substantial likelihood that Defendants Bronstein and Cosby have disclosed or used, and that Defendants will continue to use Plaintiff's trade secrets.

64. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been irreparably damaged, and Defendants have been unjustly enriched. Plaintiff's damages include lost profits and business opportunities. Defendants' unjust enrichment includes value attributable to the misappropriated information, amounts that Defendants saved in costs and development by using the misappropriated information, increased productivity resulting from the use of the misappropriated information, and increased market share. The precise amount of these damages

and unjust enrichment is not presently known, but is believed to be in excess of ten million dollars and increasing by the day. Alternatively, Plaintiff is entitled to a reasonable royalty.

65.     Defendants' actions constitute willful and malicious misappropriation in that Defendants took and used Plaintiff's Confidential Information with the deliberate intent to injure Plaintiff's business and improve their own. Accordingly, Plaintiff is entitled to an award of reasonable attorneys' fees and exemplary damages under 18 U.S.C. §1836.

66.     As a direct and proximate result of Defendants' conduct and continued use of Plaintiff's misappropriated trade secrets, Plaintiff has suffered and will continue to suffer extensive injury and harm to its business. Plaintiff is therefore entitled to an injunction preventing Defendants from continuing to use or disclose Plaintiff's trade secrets and preventing them from continuing to sell products derived from the misappropriated trade secrets.

## THIRD CAUSE OF ACTION

### VIOLATION OF ILLINOIS TRADE SECRETS ACT (765 ILCS 1065/1, et seq.)

#### (By Plaintiff Against All Defendants)

67.     Plaintiff incorporates by reference and realleges the preceding paragraphs as though fully set forth herein.

68.     Defendants violated the Illinois Trade Secrets Act, 765 ILCS 1065/1, et seq. (the "ITSA") by misappropriating trade secrets from Plaintiff for services used in, or intended for use in, interstate commerce.

69.     Defendants possessed Plaintiff's trade secrets under the ITSA including the business plans, concepts, and marketing strategy for Hulk Hogan's Real American brand beer.

70.     Plaintiff is informed and believes, and based thereon alleges, that Defendants are using and will continue to use Plaintiff's trade secrets to conduct business.

71.     Plaintiff invested substantial time and resources to generate the concept and business plan for Hulk Hogan's Real American brand beer. The information contained in these materials derived independent economic value by virtue of not being known or available to the public. Plaintiff kept this information sufficiently secret to give it a competitive advantage. It has taken affirmative measures to prevent others from acquiring it or using it by means including, but not limited to, requiring those who had access to it (including Defendants Bronstein and Cosby) to sign agreements restricting their use of Plaintiff's confidential information. Further, access to Plaintiff's systems, including employees' computers, is password protected.

72.     Plaintiff communicated its trade secrets to Defendants Bronstein and Cosby in confidence and they knew that Plaintiff intended its trade secrets to remain confidential. As such, they promised to keep Plaintiff's trade secrets confidential, and to use Plaintiff's trade secrets only on behalf of Plaintiff.

73.     Defendants Bronstein and Cosby, acting on behalf of themselves and RAHM, misappropriated trade secrets belonging to Plaintiff by unauthorized disclosure and use.

74.     Due to their positions of founding and working for RAHM, a direct competitor of Plaintiff, and their continuing development and marketing of RAHM's Real American Beer brand, there is a substantial likelihood that Defendants Bronstein and Cosby have disclosed or used, and that Defendants will continue to use Plaintiff's trade secrets.

75.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been irreparably damaged, and Defendants have been unjustly enriched. Plaintiff's damages include lost profits and business opportunities. Defendants' unjust enrichment includes value attributable to the misappropriated information, amounts that Defendants saved in costs and development by using the misappropriated information, increased productivity resulting from the use of the

misappropriated information, and increased market share. The precise amount of these damages and unjust enrichment is not presently known, but is believed to be in excess of ten million dollars and increasing by the day. Alternatively, Plaintiff is entitled to a reasonable royalty.

76.     Defendants' actions constitute willful and malicious misappropriation in that Defendants took and used Plaintiff's Confidential Information with the deliberate intent to injure Plaintiff's business and improve their own. Accordingly, Plaintiff is entitled to an award of reasonable attorneys' fees and exemplary damages under 765 ILCS 1065/4 and 1065/5.

77.     As a direct and proximate result of Defendants' conduct and continued use of Plaintiff's misappropriated trade secrets, Plaintiff has suffered and will continue to suffer extensive injury and harm to its business. Plaintiff is therefore entitled to an injunction preventing Defendants from continuing to use or disclose Plaintiff's trade secrets and preventing them from continuing to sell products derived from the misappropriated trade secrets.

## FOURTH CAUSE OF ACTION

### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

#### (By Plaintiff Against All Defendants)

78.     Plaintiff incorporates by reference and realleges the preceding paragraphs as though fully set forth herein.

79.     Plaintiff had valid and enforceable contracts with Hulk Hogan and his company TGB Entertainment, LLC through a Limited Liability Company Agreement for Running Wilde LLC ("Running Wilde") and an Ambassadorial Services Agreement.

80.     Defendants were aware of Plaintiff's contractual relationships with Hulk Hogan and TGB Entertainment.

81.    Defendants intentionally and unjustly induced a breach of those contracts by improperly soliciting Hulk Hogan to enter a business relationship with RAHM to sell Hulk Hogan's Real American brand beer in violation of their Agreements with Plaintiff.

82.    Defendants' conduct was intended to disrupt the performance of the contract, or knew that disruption was certain or substantially certain to occur.

83.    Hulk Hogan subsequently breached the contracts with Plaintiff by failing and refusing to perform his obligations under those contracts.

84.    As a result, Plaintiff was forced to terminate the contracts.

85.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered damages in an amount to be determined at trial.

86.    The aforementioned conduct of Defendants was committed with fraud, malice, or oppression, and Defendant acted willfully, or with such gross negligence as to indicate a wanton disregard for the rights of others, so as to justify an award of punitive damages.

## FIFTH CAUSE OF ACTION

## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

### (By Plaintiff Against All Defendants)

87.    Plaintiff incorporates by reference and realleges the preceding paragraphs as though fully set forth herein.

88.    Plaintiff had ongoing business relationship with Hulk Hogan and his company TGB Entertainment, LLC through a Limited Liability Company Agreement for Running Wilde LLC ("Running Wilde") and an Ambassadorial Services Agreement.

89.    Plaintiff had a reasonable expectation of entering into further business relationships with Hulk Hogan including for Hulk Hogan's Real American brand beer concept.

90.     Defendants were aware of Plaintiff's expectancy of further business relations with Hulk Hogan.

91.     Defendants intentionally and unjustly interfered and prevented the realization of further business relationships with Hulk Hogan by improperly soliciting Hulk Hogan to enter a business relationship with RAHM to sell Hulk Hogan's Real American brand beer.

92.     Defendants' conduct was intended to disrupt the business relationship, or knew that disruption was certain or substantially certain to occur.

93.     Hulk Hogan subsequently ceased working with Plaintiff and entered agreements with RAHM to sell Hulk Hogan's Real American brand beer.

94.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered damages in an amount to be determined at trial.

95.     The aforementioned conduct of Defendants was committed with fraud, malice, or oppression, and Defendant acted willfully, or with such gross negligence as to indicate a wanton disregard for the rights of others, so as to justify an award of punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court enter judgment in its favor and against Defendants as follows:

**AS TO THE FIRST CAUSE OF ACTION**

1.      For damages in excess of the jurisdictional minimum of this Court.

2.      For restitution in the amount of $348,000 from Bronstein and $231,333.33 from Cosby ███████████████████████████████████████.

**AS TO THE SECOND CAUSE OF ACTION**

1.  For damages in excess of the jurisdictional minimum of this Court;

2.  For restitution of all money unjustly and improperly received by Defendants;

3.  A reasonable royalty;

4.  An injunction preventing Defendants from continuing to use or disclose Plaintiff's trade secrets and preventing them from continuing to sell products derived from the misappropriated trade secrets; and

5.  For punitive and/or exemplary damages in an amount sufficient to punish, deter and make an example of Defendants.

**AS TO THE THIRD CAUSE OF ACTION**

1.  For damages in excess of the jurisdictional minimum of this Court;

2.  For restitution of all money unjustly and improperly received by Defendants;

3.  A reasonable royalty;

4.  An injunction preventing Defendants from continuing to use or disclose Plaintiff's trade secrets and preventing them from continuing to sell products derived from the misappropriated trade secrets; and

5.  For punitive and/or exemplary damages in an amount sufficient to punish, deter and make an example of Defendants.

**AS TO THE FOURTH CAUSE OF ACTION**

1.  For damages in excess of the jurisdictional minimum of this Court; and

2.  For punitive and/or exemplary damages in an amount sufficient to punish, deter and make an example of Defendants.

**AS TO THE FIFTH CAUSE OF ACTION**

1.  For damages in excess of the jurisdictional minimum of this Court; and

2.      For punitive and/or exemplary damages in an amount sufficient to punish, deter and make an example of Defendants.

**AS TO ALL CAUSES OF ACTION**

1.      For pre- and post-judgment interest;

2.      For attorneys' fees and costs of suit where appropriate; and

3.      For such other relief as the Court may deem just and proper.


## JURY DEMAND

Plaintiff hereby demands trial by jury against Defendants in this action on all claims so triable.

Date:  July 8, 2025           Respectfully submitted,


          /s/ Blake T. Hannafan
          Blake T. Hannafan
          Hannafan & Hannafan, Ltd.
          181 West Madison St.
          Suite 4700
          Chicago, IL. 60602
          312-527-0055
          bth@hannafanlaw.com


          Nicholas D. Myers
          *nicholas@myers.law*
          Clifford L. White
          *cliff@myers.law*
          THE MYERS LAW GROUP
          4695 MacArthur Court, Suite 200
          Newport Beach, California 92660

          Attorneys for Plaintiff CARMA HOLDCO INC.