# EXHIBIT 1

# EXECUTIVE EMPLOYMENT AGREEMENT

THIS EXECUTIVE EMPLOYMENT AGREEMENT (this "**Agreement**") is entered into between Tyson 2.0 Inc., a Delaware corporation (the "**Company**") and Chad Bronstein (the "**Executive**") (together, the "**Parties**"). This Agreement shall be effective as of the date Executive and the Company sign the Agreement, as indicated below (the "**Effective Date**").

WHEREAS, the Company is engaged in the business of creating, acquiring, developing, licensing, and distributing various intellectual property assets, together with any other business activities conducted or proposed to be conducted by the Company; and

WHEREAS, the Company desires to employ Executive as its President and Chairman of the Company's Board of Directors ("**President**") and Executive desires to be employed by the Company as its President, on the terms and conditions contained herein;

WHEREAS, the Company and Executive have been in agreement as to the material terms and conditions of Executive's employment as of May 1, 2022, but wish to memorialize such terms and conditions herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. Employment. The Company shall employ Executive and Executive shall be employed by the Company pursuant to this Agreement commencing as of the Effective Date and continuing until such employment is terminated in accordance with the provisions hereof. Executive's employment with the Company shall be "at will," meaning that Executive's employment may be terminated by the Company or Executive for any reason subject to the terms of this Agreement.

2. Reporting, Duties, and Location.

(a) Position. Executive shall be employed as the Company's President and will report to the Company's Board of Directors ("**Board**"). Executive will perform the duties commensurate with Executive's position, as well as any other duties that may be assigned to Executive by the Board from time to time.

(b) Good Faith Efforts/Full-time. Executive will devote Executive's best efforts and all of Executive's business time and attention to the performance of Executive's duties for the Company and will diligently, faithfully, and competently perform Executive's duties hereunder. Executive will act in a manner consistent with Executive's reasonable beliefs as to the best interests of Company at all times. Executive will not hold any positions, whether paid or unpaid, in any educational, civic, or charitable entity or organization without prior written consent of the Board.

(c) Work Location. Executive shall work remotely out of Executive's home in Florida; provided, however, that Executive understands and agrees that Executive may be required to travel from time to time to other locations for business purposes, including, but not limited to, the Company's headquarters in Chicago, Illinois. In addition, Executive understands

and agrees that Executive shall be considered an employee of the Company's headquarters locations for reporting purposes, unless otherwise prohibited by applicable law.

3. Compensation and Benefits.

(a) Base Salary. Beginning on the Effective Date, the Company will pay to Executive a base salary in the amount of $350,000 annualized (the "**Base Salary**"), payable to Executive during employment with the Company in substantially equal semimonthly installments in accordance with the Company's regular payroll practices. The Company may review and prospectively adjust Executive's Base Salary from time to time in the sole discretion of the Board.

(b) Discretionary Bonus. During employment with the Company, Executive will be eligible to receive payment of a discretionary fiscal year bonus of up to 100% of Executive's then-current Base Salary, prorated for any partial fiscal year of employment under this Agreement (the "**Bonus**"), based upon, among other factors, the Company's performance and Executive's individual performance; provided, however, that such performance criteria may be updated and communicated to Executive from time to time in the discretion of the Board. The actual amount of Executive's Bonus, if any, shall be determined in the reasonable discretion of the Board, and the terms of any applicable incentive compensation plan that may be in effect from time to time. In order to remain eligible to receive payment of the Bonus or any portion thereof, Executive must be employed with the Company through the date the Bonus, or any portion thereof, is made payable.

(c) Shares of Common Stock. As additional consideration for Executive's agreement to and compliance with the terms and covenants set forth in this Agreement, the Company has offered Executive the opportunity to purchase, and Executive has purchased from the Company, 1,288,978 shares of common stock of the Company, pursuant to the terms and conditions of the Company's standard form restricted stock purchase agreement.

(d) Benefits. During employment with the Company, the Company will provide or offer for Executive's participation the benefits generally provided or offered by the Company to its comparably-situated executive employees (collectively, "**Benefits**"), including group health insurance, if and to the extent that Executive is eligible to participate in accordance with the terms and conditions of the applicable benefit plan or program. Subject to the immediately-preceding sentence and applicable legal requirements, benefits are subject to change or cancelation with or without advance notice.

(e) Automobile Allowance. During employment with the Company, Executive will receive an automobile allowance in the gross amount of $1000 each full month worked, subject to applicable withholding and other taxes, payable on the last regular payroll of each month, to cover expenses for the use and maintenance of Executive's personal automobile, including all mileage costs associated with the business use of Executive's personal automobile.

(f) Expense Reimbursement. The Company will reimburse Executive for reasonable and necessary business expenses incurred by Executive during employment with the Company, subject to all terms and conditions of the Company's expense reimbursement policies and practices in effect from time to time.

    (g) Withholding. All compensation to be paid to Executive will be subject to withholding for all required federal, state, and local taxes, amounts to be withheld under applicable benefit plans or programs, any other amounts required to be withheld by law, court order, or otherwise, and any amounts authorized by Executive to be withheld.

4. Termination.

(a) Termination by the Company for Cause. Although the Company anticipates a mutually rewarding employment relationship with Executive, the Company may terminate Executive's employment for Cause (as defined below), effective immediately upon written notice to Executive. As used in this Agreement, "**Cause**" means the occurrence of any of the following on the part of Executive: (i) any willful, intentional, reckless, or negligent conduct that has or could reasonably be expected to have an adverse effect on the Company; (ii) misappropriation, embezzlement, fraud, theft, or dishonesty; (iii) behavior that reflects on the Company in a negative manner or adversely affects the Company's business, reputation, or relationships; (iv) willful or intentional failure to perform any of Executive's job duties or any lawful directive of the Board; (v) Executive's conviction of, or pleading of guilty or *nolo contendere* to, a felony or crime involving moral turpitude; (vi) violation of any law or regulation pertaining to the business of the Company; (vii) material breach of any of the Company's written policies; or (viii) breach of any written agreement between the Company and Executive, including, but not limited to, this Agreement. With respect to subsections (i), (iv), (vii), or (viii), in order for the Company's termination of Executive's employment to be for "Cause," the Company will first provide written notice to Executive describing in reasonable detail the basis for the Company's assertion of Cause. The Company may then terminate Executive's employment for Cause if the basis for the Company's assertion of Cause remains uncured by Executive to the satisfaction of the Company within 30 days following the Company's delivery of such notice to Executive. Notwithstanding the foregoing, if Executive's employment is terminated other than pursuant to this Section 4(a), after which the Company determines that Executive's acts or omissions would have constituted grounds to terminate Executive's employment for Cause, then Executive's employment will be deemed to have been terminated for Cause.

(b) Termination by the Company without Cause. The Company may terminate Executive's employment at any time, for any reason other than Cause immediately upon written notice to Executive.

(c) Termination by Executive for Good Reason. Executive may terminate Executive's employment hereunder at any time for any reason, including but not limited to, Good Reason. For purposes of this Agreement, "**Good Reason**" shall mean the occurrence of any of the following events without Executive's consent (each, a "**Good Reason Condition**"): (i) a material diminution in Executive's Base Salary; (ii) assignment to Executive of duties or responsibilities or a reporting line above Executive that are inconsistent with Executive's experience and expertise or are materially inconsistent with Executive's position, duties and reporting line above Executive as provided under Section 2(a) of this Agreement; or (iii) a material breach of this Agreement by the Company. In order for Executive's termination of Executive's employment to be deemed for "Good Reason," Executive will first provide written notice to the Company describing in reasonable detail the basis for Executive's determination that a Good Cause Reason Condition has occurred. Executive may then terminate Executive's employment for Good Reason if the Good Reason Condition remains uncured by the Company to the satisfaction of Executive within 30 days following Executive's delivery of such notice to the Company.

(d) Termination by Executive without Good Reason. Executive may voluntarily terminate Executive's employment, for any reason other than Good Reason, upon 30 days' advance written notice to the Company; provided, however, that any time during such 30-day period, the Company may direct Executive to cease to perform services for or on behalf of the Company except those assigned by the Chairman or the Board, and such directive will not be construed as a termination of Executive's employment.

(e) Termination as a Result of Executive's Disability. The Company may terminate Executive's employment hereunder in the event of Executive's Disability (as defined below), effective immediately upon written notice to Executive (or Executive's legal representative, if applicable). As used in this Agreement, "**Disability**" means the inability of Executive to perform Executive's job duties by reason of a physical or mental disability or infirmity (i) for more than 120 days in any consecutive 180-calendar day period or (ii) at such earlier time as Executive submits or the Company receives satisfactory medical evidence that Executive has a physical or mental disability or infirmity which will likely prevent Executive from returning to the performance of Executive's duties for more than 90 consecutive calendar days. In the event of a dispute regarding whether Executive has a Disability, such determination will be made by a physician selected by the Company, at the Company's sole expense; provided, however, that Executive's Disability will be conclusively presumed if such determination is made by an insurer providing disability insurance coverage to Executive or to the Company in respect of Executive. Executive will submit to a medical examination by such physician, and Executive (or Executive's legal representative, if applicable) will execute and provide to such physician (with a copy to the Company) a release allowing disclosure to the Board of all information pertaining to such medical examination.

(f) Termination in the Event of Executive's Death. Executive's employment will terminate immediately in the event of Executive's death.

5. Consequences of Termination.

(a) Termination Due to Death or Disability. In the event that Executive's employment is terminated pursuant to Section 4(e) or 4(f) of this Agreement, Executive or Executive's estate, as applicable, will be entitled to the following: (i) Executive's then-current Base Salary through the effective date of termination (the "**Termination Date**"); (ii) reimbursement for any approved expenses for which Executive is entitled to be reimbursed up to and including the Termination Date; (iii) any accrued but unused paid time off (if any) for which Executive is entitled to payment upon termination in accordance with Company policy or applicable law, and (iv) the benefits through the Termination Date (Sections 5(a)(i) through 5(a)(iv) collectively, the "**Accrued Rights**"). Executive will not be entitled to any further payments or benefits as a result of termination of Executive's employment pursuant to Section 4(e) or 4(f).

(b) Termination for Cause or Termination by Executive without Good Reason. In the event that Executive's employment is terminated by the Company for Cause pursuant to Section 4(a) or by Executive without Good Reason pursuant to Section 4(d) of this Agreement, then the Company will provide to Executive the Accrued Rights. Executive will not be entitled to any further payments or benefits as a result of termination of Executive's employment pursuant to Section 4(a) or Section 4(d).

(c) Termination without Cause or for Good Reason. In the event that Executive's employment is terminated by the Company without Cause pursuant to Section 4(b) or terminated by Executive for Good Reason pursuant to Section 4(c), then in addition to the Accrued Rights, the Company will provide Executive with the following (collectively, the "**Separation Benefits**"):

(i) The Company will pay to Executive the Executive's then-current Base Salary for a period of twelve months following the termination of Executive's employment (the "**Salary Continuation Payments**"). The Salary Continuation Payments will be paid in accordance with the Company's regular payroll schedule commencing on the Company's first regular payroll date following the date on which the Release (defined below) becomes irrevocable.

(ii) If Executive is a participant in the Company's group health insurance plan on the Termination Date and timely elects continuation coverage under applicable law, the Company will pay the premiums for such coverage until the earlier of (a) twelve months, or (b) the date on which Executive becomes eligible for health insurance coverage under another group plan, subject to all terms and conditions applicable to plan participants actively employed by the Company (the "**Insurance Benefit**"). If Executive elects to continue such coverage under law upon expiration of the Insurance Benefit, Executive will be responsible for the full cost of such coverage.

(d) Conditions for Receiving the Separation Benefits. Executive's entitlement to the Separation Benefits is subject to (i) Executive's compliance with the terms and conditions of this Agreement, (ii) Executive's execution (without revocation) and delivery to the Company of a separation agreement and general release in a form to be provided by and deemed acceptable to the Company (the "**Release**") within a period that is no longer than 60 calendar days following the Termination Date; and (iii) Executive's execution and delivery to the Company of such other administrative documents, information and property as the Company may reasonably request consistent with its customary policies and practices.

6. Sections 280G and 409A.

(a) In the event that any payment or benefit that is either received by Executive or paid on Executive's behalf, under this Agreement together with any payments or benefits under any other agreement or arrangement between the Company and its affiliates and Executive (collectively, the "**Payments**"), would be subject to the tax imposed by Section 4999 of the Code (and any other similar tax) (the "**Excise Tax**"), the Company shall, with respect to such Payments, use its best efforts to obtain a vote satisfying the requirements of Section 280G(b)(5) of the Code, such that no portion of the Payments will be subject to such Excise Tax. Subject to the Company's compliance with the foregoing, to the extent that any of the Payments would constitute an "excess parachute payment" within the meaning of Section 280G of the Code, the amount of such Payments will be reduced to the amount that is one dollar ($1) less than the maximum amount Executive may receive without becoming subject to the Excise Tax (the "**Cutback Amount**"); provided that that the foregoing reduction in the amount of Payments will not apply if the after-tax value (taking into account the applicable federal, state and local income taxes and the excise tax) to Executive of the Payments prior to reduction in accordance herewith is greater than the after-tax value to Executive if the Payments are reduced in accordance herewith. If a reduction in payments or benefits is necessary so that the Payments equal the Cutback Amount, reduction will occur in the following order: (a) cash payments will

be reduced first and in reverse chronological order such that the cash payment owed on the latest date following the occurrence of the event triggering such excise tax will be the first cash payment to be reduced; (b) accelerated vesting of performance-based equity awards will be cancelled or reduced next and in the reverse order of the date of grant for such awards, with full-value awards reduced before any performance-based appreciation awards are reduced; (c) health and welfare benefits will be reduced and in reverse chronological order such that the benefit owed on the latest date following the occurrence of the event triggering such excise tax will be the first benefit to be reduced; and (d) accelerated vesting of time-based equity awards will be cancelled or reduced last and in the reverse order of the date of grant for such awards, with full-value awards reduced before any appreciation awards are reduced.

(b) To the maximum extent permitted by law, this Agreement will be interpreted in such a manner that all post-termination payments to Executive are either exempt from, or comply with, Section 409A of the Internal Revenue Code and the regulations and other interpretive guidance issued thereunder (collectively, "**Section 409A**"). The Company will undertake to administer, interpret, and construe this Agreement in a manner that does not result in the imposition on Executive of any additional tax, penalty, or interest under Section 409A. If the Company determines in good faith that any provision of this Agreement would cause Executive to incur an additional tax, penalty, or interest under Section 409A, the Company and Executive will use reasonable efforts to reform such provision, if possible, in a mutually agreeable fashion to maintain, to the maximum extent practicable, the original intent of the applicable provision without violating the provisions of Section 409A or causing the imposition of such additional tax, penalty, or interest under Section 409A.

7. Confidential Information.

(a) As used in this Agreement, the term "**Confidential Information**" means all information, knowledge and data, whether oral or written, electronic or in any other form, that is not generally known to the public or otherwise readily ascertainable by proper means and relates to the actual or anticipated business or research and development of the Company, including, but not limited to, proprietary information, technical data, trade secrets, know-how, flow-charts, research, software, developments, inventions, processes, formulas, algorithms, prices and costs, technology, designs, drawings, engineering, hardware configurations, source and object codes, data and databases, compilations, marketing, finances, forecasts, product plans, business plans, internal processes, sales strategy, business strategy, and other information regarding the Company's business, products, services, markets, suppliers, contributors, customers and customer lists, clients and client lists, terms of customer agreements, information about customers or clients learned during the period of Executive's employment with the Company, including, but not limited to, the identities, preferences and purchasing histories of customers of the Company on whom Executive called, with whom Executive became acquainted, or about whom Executive received information during the period of, and because of Executive's employment with the Company, and other information designated "confidential," "proprietary," and/or other similar designation. "Confidential Information" also includes information that is not generally known to the public or otherwise readily ascertainable by proper means that is owned or controlled by any third party that may disclose such information to the Company or to Executive under any obligation of confidentiality in the course of the Company's business. The term "Confidential Information" does not, however, include information that is in the public domain (other than information that became public as a result of a breach of a duty of confidentiality) or information rightfully received by Executive outside the course of Executive's

employment with the Company from a third party who does not owe the Company a duty of confidentiality with respect to such information.

(b) Executive agrees at all times during the period of Executive's employment with the Company and thereafter to: (i) hold the Confidential Information in the strictest confidence and not directly or indirectly copy, distribute, disclose, divert, or disseminate, or give access to, in whole or in part, any of such Confidential Information to any person, firm, corporation, association, or other entity except (x) to authorized agents of the Company who have a need to know such Confidential Information for the purpose for which it is disclosed, or (y) to other persons for the benefit of the Company, in the course and scope of Executive's employment with the Company; and (ii) refrain from directly or indirectly using the Confidential Information other than as necessary and as authorized in the course and scope of Executive's employment with the Company.

(c) Executive represents that Executive's performance of all terms of this Agreement does not breach, has not breached, and will not breach any agreement to keep in confidence proprietary information, knowledge, or data (if any) acquired by Executive from any third party in confidence or trust prior or subsequent to the commencement of Executive's employment with the Company. Executive will not, during the period of Executive's employment with the Company, improperly use or disclose any proprietary information or trade secrets of any former employer or other person or entity, and Executive will not bring onto the premises of the Company any non-public document or proprietary information belonging to any such third party, unless such document or information has become known to the public or within the industry through no fault or breach of Executive's or others or unless consented to in writing by such third party.

(d) Executive recognizes that the Company has received and in the future will receive from third parties confidential and/or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Executive will hold all such confidential or proprietary information in the strictest confidence and not disclose it to any person or entity or use it except as necessary and as authorized in carrying out Executive's work for the Company consistent with the Company's agreement with such third party.

(e) Executive acknowledges that, pursuant to 18 U.S.C. Section 1833(b), Executive will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (i) is made (x) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, and (y) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. If Executive files a lawsuit for retaliation against the Company for Executive's reporting of a suspected violation of law, Executive may disclose a trade secret to Executive's attorney and use the trade secret information in the court proceeding if Executive: (A) files any document containing the trade secret under seal; and (B) only discloses that portion of the trade secret information which is required to be disclosed pursuant to court order; and (C) uses Executive's best efforts to obtain assurances that confidential treatment will be given to such trade secret information.

(f) Nothing in this Agreement prohibits Executive from reporting possible violations of federal law or regulation to any governmental agency or entity, including but not limited to the Department of Justice, the Securities and Exchange Commission, Congress, and

any agency Inspector General, or making other disclosures that are protected under the whistleblower provisions of federal or state law or regulation. Executive understands that Executive does not need the prior authorization of the Company to make any such reports or disclosures, and that Executive is not required to notify the Company that Executive has made such reports or disclosures.

8. Conflicting Employment and Non-Competition. Executive agrees that during the period of Executive's employment with the Company Executive will not engage in any other employment (including but not limited to self-employment), occupation or consulting arrangement, nor will Executive engage in any other activities that conflict with Executive's obligations to the Company. During the Restricted Period (as defined below), Executive will not, anywhere in the Restricted Territory (as defined below), without the Company's prior written consent, directly or indirectly, alone or as a partner, member, manager, owner, joint venturer, officer, director, employee, consultant, agent, contractor, stockholder or in any other capacity of any company or entity, engage in the Business (as defined below) in a capacity that is similar to one or more of the job functions Executive performed for the Company, have any financial interest in any company or entity engaging in the Business or make any loans to any company or entity engaging in the Business. Notwithstanding the foregoing, Executive's ownership of not more than two percent (2%) of the outstanding shares of stock of any corporation having a class of securities actively traded on a national securities exchange or on the NASDAQ Stock Market shall not be deemed, in and of itself, to violate the provisions of this Section 8. Executive agrees and acknowledges that the restrictions in this Section 8 shall apply throughout the Restricted Territory, and that the geographic scope of the restriction is necessary and reasonable because the Company conducts business at least nationally, and the restriction is necessary to protect the legitimate business interests of the Company. Executive further agrees and acknowledges that the restrictions in this Section 8 shall apply to self-employment.

9. Non-Solicitation.

(a) Solicitation of Employees. Executive agrees that during Executive's employment with the Company and during the Restricted Period (as defined below), Executive shall not directly or indirectly solicit, induce, recruit or encourage any Company Employee (as defined below) to leave his or her employment relationship with the Company, or take away or hire any such Company Employee, or attempt to solicit, induce, recruit, encourage or take away or hire any such Company Employee, either for Executive or for any other person or entity. For purposes of this Agreement, the term "**Company Employee**" means any person who is an employee of the Company at the time of Executive's solicitation of and/or communication with such person.

(b) Solicitation of Customers and Business Relations. Executive agrees that during Executive's employment with the Company and during the Restricted Period (as defined below), Executive shall not directly or indirectly induce or solicit or attempt to induce or solicit any strategic partner or any material vendor or supplier of the Company whom Executive has serviced or whose name became known to Executive in connection with Executive's employment with the Company (collectively, "**Business Relations**") or Customer (as defined below). Executive's agreement "not to solicit" means that Executive will not directly or indirectly initiate, contact or engage in any contact or communication, of any kind whatsoever, that has the purpose or effect of inviting, assisting, encouraging or requesting any Customer or Business Relation to: (i) transfer his/her/its business from the Company to Executive, Executive's employer or any third party, or (ii) purchase any products or services from

Executive, Executive's employer or any third party that are competitive with the Company's products or services, or use any products or services of Executive's, Executive's employer or of any third party that are competitive with the Company's products or services, or (iii) otherwise diminish, divert, discontinue or terminate his/her/its patronage and/or business relationship with the Company. For purposes of this Agreement, the term "**Customer**" means any customer of the Company: (x) with which, for which or to which Executive communicated, performed any services, or sold or licensed any products during the 24-month period preceding the termination of Executive's employment with the Company or (y) of which Executive have or had knowledge during, and because of, Executive's employment with the Company.

10. Consideration for and the Reasonableness of Sections 7, 8 and 9; Tolling; Modification; Definitions of Restricted Period and Restricted Territory.

(a) Consideration. Executive agrees and acknowledges that Executive has received valuable and adequate consideration in exchange for the restrictions in Sections 7, 8 and 9 of this Agreement, including but not limited to, the offer of employment or continued employment with the Company, access or continued access to the Company's Confidential Information, Customers and Business Relations, training, and a grant of equity in the Company.

(b) Reasonableness of Restrictions. Executive understands and recognizes that the Company's relationships with its Business Relations, Customers and Company Employees are important. Executive further understands and recognizes that the Company's Confidential Information is critical to the business and success of the Company, and Executive acknowledges the steps the Company has taken, is taking and will continue to take to develop, preserve and protect its relationships with its Business Relations, Customers and Company Employees, and the Confidential Information. Accordingly, Executive agrees that the scope and duration of the restrictions and limitations described in this Agreement, particularly in Sections 7, 8 and 9, are reasonable and necessary to protect the legitimate business interests of the Company, and Executive agrees and acknowledges that all restrictions and limitations relating to the period following the end of Executive's employment with the Company will apply regardless of the reason Executive's employment ends. Executive also agrees and acknowledges that the enforcement of Sections 7, 8 and 9 will not in any way preclude Executive from becoming gainfully employed or engaged as a contractor in such manner and to such extent as to provide Executive with an adequate standard of living.

(c) Tolling. In the event of a breach or violation by Executive of Section 8 and/or 9 of this Agreement, the Restricted Period shall be tolled (retroactive to the date such breach commenced) until such breach or violation has been duly cured.

(d) Modification. If any provision or term in Sections 7, 8 and/or 9 of this Agreement is declared invalid or unenforceable by a court of competent jurisdiction, the invalid and unenforceable portion shall be reformed to the maximum time, geographic scope, activity-related restrictions and/or limitations permitted by applicable law, so as to be valid and enforceable.

(e) Definition of Restricted Period. For purposes of this Agreement, the term "**Restricted Period**" shall mean the period commencing on the Effective Date of this Agreement and terminating on the first anniversary of the date on which Executive's employment with the Company terminates for any reason.

(f) Definition of Restricted Territory. For purposes of this Agreement, the term "**Restricted Territory**" shall mean any geographic region of the United States in which the Company conducted or, with Executive's assistance or knowledge, actively prepared to conduct business within the six (6) months prior to the termination of Executive's employment with the Company for any reason.

11. Intellectual Property.

(a) Definition of Intellectual Property. As used in this Agreement, the term **"Intellectual Property"** means all inventions, original works of authorship, trade secrets, concepts, ideas, discoveries, developments, improvements, combinations, methods, designs, trademarks, trade names, software, data, mask works, and know-how, whether or not patentable or registrable under copyright, trademark or similar laws, including, but not limited to, all specifications, data, know-how, formulae, algorithms, designs, compositions, processes, computer programs (including object code and source code, in machine readable and printed or otherwise perceptible form as well as software development, architecture, input, and design), computer database technologies, systems, website and back-end technologies, customer lists, vendor lists, financial models, websites (including domain names), marketing plans (including brand and logo work), and any other information relating to the Company's Business.

(b) Prior Intellectual Property. Executive has attached hereto, as Exhibit A, a list describing with particularity all Intellectual Property that was created by Executive prior to Executive's employment with the Company that relates in any way to the Company's current or proposed business, including, but not limited to, products or research and development (collectively referred to as "**Prior Intellectual Property**"); if no such list is attached, Executive represents that there is no such Prior Intellectual Property. If, in the course of Executive's employment with the Company, Executive incorporates into a Company product, process, service, documentation, or other work product, or uses in connection with Executive's employment with the Company, any Prior Intellectual Property in which Executive has any interest, Executive will promptly advise the Company of such incorporation or use, and Executive hereby grants to the Company a nonexclusive, royalty-free, fully paid-up, irrevocable, perpetual, transferable, worldwide license (with unlimited right to sublicense) to make, have made, use, offer for sale, sell, import, reproduce, distribute, publicly perform, publicly display, make derivative works based upon, and otherwise fully exploit such Prior Intellectual Property.

(c) Disclosure and Assignment of Company Intellectual Property. As used in this Agreement, the term "**Company Intellectual Property**" means any Intellectual Property that Executive may solely or jointly conceive, reduce to practice, author, or otherwise create, or cause to be conceived, reduced to practice, authored, or otherwise created, during the period of Executive's employment with the Company or, to the extent otherwise relating to the Business, for a period of six (6) months following the termination of Executive's employment. Executive will promptly make full written disclosure to the Company and will hold in trust for the sole right and benefit of the Company all Company Intellectual Property. Executive acknowledges that all Company Intellectual Property comprising original works of authorship fixed in a tangible medium that Executive creates within the scope of and during the period of Executive's employment with the Company are, to the greatest extent permitted by applicable law, "works made for hire" as that term is defined in the United States Copyright Act. Executive hereby irrevocably assigns to the Company, or the Company's designee, all of Executive's rights, title, and interest in and to such Company Intellectual Property, except as provided in Section 11(f) below and/or under applicable state law. Executive understands and acknowledges that the

decision whether or not to commercialize or market any Company Intellectual Property developed by Executive solely or jointly with others is within the Company's sole discretion and for the Company's sole benefit and that no royalty or other consideration will be due to Executive as a result of the Company's efforts to commercialize or market any such Company Intellectual Property.

(d) Maintenance of Records. Executive shall keep and maintain adequate and current written records of all Company Intellectual Property that is conceived, reduced to practice, authored, or otherwise created by Executive or at Executive's direction (solely or jointly with others) during the period of Executive's employment with the Company. Such records will be in the form of notes, sketches, drawings, electronic communications and files, and any other format that may be specified by the Company. Such records will be available to and remain the sole property of the Company at all times. Executive will not remove such records from the Company's place of business except as expressly permitted by Company policy which may, from time to time, be revised at the sole election of the Company for the purpose of furthering the Company's business. As used in this Agreement, the term "**Business**" means (i) the production and marketing for sale of cannabis and other cannabis-related products, or (ii) the provision, development, marketing, sale, or maintenance of products or services which are substantially similar to those developed, marketed, distributed, sold, maintained, or otherwise provided by, or actively planned to be developed, marketed, distributed, sold, maintained, or otherwise provided by the Company during the term of Executive's employment with the Company.

(e) Patent and Copyright Registrations. Executive shall assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Company Intellectual Property in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto and the execution of all applications, specifications, oaths, assignments, and all other instruments which the Company deems necessary to apply for, obtain, maintain, and transfer such rights and to assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title, and interest in and to such Company Intellectual Property. Executive further acknowledges that Executive's obligation to execute or cause to be executed, when it is in Executive's power to do so, any such instrument or papers shall continue after the termination of Executive's employment with the Company. If the Company is unable for any reason to secure Executive's execution of any instrument or papers to apply for or to pursue any application for any United States or foreign patents, copyright, or trademark registrations, or other protection of any Company Intellectual Property, then Executive will irrevocably designate and appoint the Company and its duly authorized officers and agents as Executive's agent and attorney in fact, to act on Executive's behalf and in Executive's stead, to execute and file any instruments and papers related to such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent, copyright, trademark registrations, or other protection of Intellectual Property thereon with the same legal force and effect as if executed by Executive.

(f) Exception to Assignments. Executive understands that the provisions of this Agreement requiring assignment of Company Intellectual Property and Prior Intellectual Property to the Company will not apply in the event of a specifically applicable state law, regulation, rule, or public policy which provides that notwithstanding the express language of this Agreement that certain patents, patent applications, patentable inventions or other patent rights may not be assigned to the Company (such a law, regulation, rule or policy, if any, is a "**Specific Inventions Law**"). If applicable, this Agreement will not be deemed to require

assignment of any Company Intellectual Property or Prior Intellectual Property which qualifies fully for protection under such Specific Inventions Law by virtue of the fact that any such Company Intellectual Property or Prior Intellectual Property was, for example (but subject in each and every instance to the specific requirements of such Specific Inventions Law), developed entirely on Executive's own time without using the Company's equipment, supplies, facilities, Confidential Information or trade secrets and neither related to the Company's actual or anticipated business, research or development, nor resulted from work performed by Executive for the Company. In the absence of an applicable Specific Inventions Law, this Section 11(f) shall be deemed void and without effect.

12. Non-Disparagement. At all times during and following Executive's employment with the Company, Executive will not make any statement (whether verbal, anonymously or not, in writing, or electronically, including on any social media site or other Internet forum) that is intended to or could be reasonably expected to disparage or reflect unfavorably on the Company, its employees, or its products or services. In addition, Executive shall not directly or indirectly cause or direct others to take any actions or make any statements that violate this Section 12. Executive understands and agrees that nothing in this Agreement, including in this Section 12 waives or attempts to waive Executive's right to engage in communications allowable by applicable law, including Executive's ability to discuss and/or disclose information about unlawful acts in the workplace, such as harassment or discrimination, or any other conduct that Executive has a good faith reason to believe is unlawful.

13. Notice to Future Employers. During the Restricted Period, (a) Executive will notify the Board in writing of any subsequent occupation of Executive, whether as an owner, employee, officer, director, independent contractor, or the like, and Executive's duties and responsibilities in that position, and (b) Executive will inform each prospective employer or principal, prior to accepting employment or an engagement, of the existence of this Agreement and its terms. Executive acknowledges that during the Restricted Period, the Company will have the right to independently notify any potential or actual future employer or principal of Executive of Executive's obligations under this Agreement and provide such employer or principal with a copy of this Agreement. The Company also will be entitled, at its election, to notify any such actual or potential employer or principal of the Company's understanding of the requirements of this Agreement and what steps, if any, the Company intends to take to ensure compliance with or enforcement of this Agreement. However, the Company's decision not to avail itself of its rights under this Section 13 will not in any way affect its right to obtain enforcement of any provision of this Agreement.

14. No Conflicting Obligation or Use.

(a) Executive represents and warrants that Executive is under no restriction or covenant (a "**Prior Covenant**") that would prevent Executive from accepting employment with the Company or performing Executive's job duties and responsibilities in any capacity. Without limiting the foregoing, Executive represents and warrants that Executive is not a party to any confidentiality, non-solicitation or non-competition covenant or any other restrictive covenant or agreement with any other person or entity, except as may have been disclosed to the Company in writing and attached to this Agreement as an addendum, none of which has been or will be violated by Executive or by the Company's conducting of its business as currently conducted and as proposed to be conducted.

(b) Executive agrees not to use in connection with Executive's employment, or to disclose to the Company, or induce the Company to use, any confidential or proprietary information or material belonging to any previous employer or other person or entity or which is otherwise protected by applicable law or otherwise ("**Protected Information**"). Executive acknowledges and understands that the Company has hired Executive because of Executive's general skills and abilities and not because of Executive's knowledge or possession, if any, of any confidential or proprietary information of any former employer, and the Company has not requested, does not desire to receive, and prohibits its employees from making use of any Protected Information.

(c) Executive understands that the Company is relying upon the representations, warranties, and agreements set forth in this Section 14 in agreeing to employ Executive, and Executive will indemnify and defend the Company from any loss, cost, damage or expense (including attorneys' fees and experts' fees), that may arise directly or indirectly from Executive's breach of the representations, warranties, or agreements set forth in this Section 14.

15. Remedies. Executive acknowledges and agrees that the Company will not have an adequate remedy at law for Executive's breach of this Agreement, and the damages that the Company would sustain as a result of any such breach would be difficult, if not impossible, to quantify. Therefore, Executive acknowledges and agrees that, in addition to any other remedies to which the Company may be entitled, whether at law or in equity, including monetary damages, the Company will be entitled to injunctive relief (without bond) to enjoin Executive (and those acting in concert with Executive, if/as applicable) from the breach of this Agreement. The prevailing party in any action or proceeding brought to enforce this Agreement will be entitled to recover from the party that does not prevail reasonable attorneys' fees and costs incurred by such prevailing party in connection with the action or proceeding.

16. Opportunity to Review and Consider this Agreement. Executive agrees and acknowledges that Executive may take, and Executive had the opportunity to take, at least 14 calendar days to review and consider this Agreement prior to executing this Agreement. Executive further agrees and acknowledges that Executive may execute this Agreement prior to the expiration of the aforementioned fourteen-day period, and if Executive does so, Executive is doing so voluntarily and without coercion or pressure from the Company. Executive agrees and acknowledges that the Company has advised Executive to consult with an attorney prior to executing this Agreement.

17. Miscellaneous.

(a) Incorporation of Recitals. The Recitals in this Agreement are incorporated and made a part of this Agreement.

(b) Assignment. This Agreement cannot be transferred or assigned by Executive. However, this Agreement may be assigned or transferred by the Company without Executive's consent, including, but not limited to, pursuant to a sale of the business, merger, consolidation, share exchange, sale of substantially all of the Company's assets, or other reorganization, or through liquidation, dissolution or otherwise, whether or not the Company is the continuing entity.

(c) No Waiver. No waiver by either party hereto at any time of any breach by the other party hereto of, or compliance with, any condition or provision of this Agreement to be

performed by such other party will be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time.

(d) Severability. Subject to the provisions of Section 10(d) hereof, if one or more of the provisions in this Agreement are deemed void by law, then the remaining provisions will continue in full force and effect.

(e) Drafting and Construction. THE TERMS OF THIS AGREEMENT HAVE BEEN CONSIDERED AND NEGOTIATED BETWEEN THE PARTIES HERETO IN AN ARM'S LENGTH TRANSACTION, AND SHALL NOT BE CONSTRUED AGAINST EITHER PARTY BY REASON OF THE DRAFTING OR PREPARATION HEREOF. Titles and headings to sections hereof are for the purpose of reference only and do not affect the provisions hereof or the rights or obligations of the parties hereto. The use of the neuter herein is deemed to include all genders. The use of either the singular or plural herein includes the other unless the context clearly requires otherwise.

(f) Governing Law. This Agreement will be governed by the laws of the State of Illinois. Executive hereby expressly consents to the personal jurisdiction of the state and federal courts located in Chicago, Illinois for any lawsuit arising from or relating to this Agreement and acknowledges that such courts shall be the sole and exclusive venue for any such lawsuits (except with respect to post-judgment enforcement proceedings) filed by either Executive or the Company; provided, however, that nothing in this Section 17(f) shall restrict the Company from bringing a lawsuit in another venue to the extent the Company is also bringing a lawsuit against a third party who is not subject to jurisdiction in Chicago, Illinois or from taking other action in other jurisdictions with respect to enforcement of Court orders, subpoenas, or judgments.

(g) Amendment. No provision of this Agreement may be modified, waived or discharged unless such waiver, modification or discharge is agreed to in writing and signed by Executive and a representative of the Company's Board.

(h) Counterparts. This Agreement may be executed counterparts, each of which will be deemed an original, but both of which together will constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including .pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method, and any counterpart so delivered will be deemed to have been duly and validly delivered and be valid and effective for all purpose.

(i) Entire Agreement. This Agreement contains the entire agreement and understanding of the parties in respect of the subject matters described in this Agreement. This agreement supersedes all prior agreements and understandings (whether oral or written) between the parties with respect to its subject matters.

**IN WITNESS WHEREOF**, the parties hereto have executed this Executive Employment Agreement voluntarily and of their own free act and deed, without any coercion, duress or undue influence, as follows.

TYSON 2.0 INC.

Tyson 2.0. INC Board Approved

By: DocuSigned by: Adam Wilks E2C4240E67D84B4...

Title:

Date: May 1st, 2022

CHAD BRONSTEIN

Signature: DocuSigned by: 05152B23111845D...

Date: May 1st, 2022

**Exhibit A**

**LIST OF PRIOR INTELLECTUAL PROPERTY
AND ORIGINAL WORKS OF AUTHORSHIP**

| Title | Date | Identifying Number or Brief Description |
| --- | --- | --- |

___ No inventions or improvements
___ Additional Sheets Attached
___ Due to confidentiality agreement(s) with prior employer(s), I cannot disclose certain inventions that would otherwise be included on the above-described list.

Executive's Signature:____________________

Print Name: ___________________________

Dated: __________, 20__

33658165.5